UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

KFC CORPORATION PLAINTIFF

v. CIVIL ACTION NO. 3:11-CV-00479

TEXAS PETROPLEX, INC., *et al.* DEFENDANTS

**MEMORANDUM OPINION**

This matter is before the court on the motions of defendants KFC Corporation ("KFCC"), Mohammad (a/k/a Mike) Tatari, Naim Tatari, and Lama Tatari to dismiss for lack of personal jurisdiction and improper venue (DN 13) and to stay consideration of the plaintiff's motion for a preliminary injunction (DN 16).[1]

**I**

The plaintiff in this action is KFC Corporation ("KFCC"), which is a Delaware Corporation with a principal place of business in Louisville, Kentucky. According to the allegations in KFCC's complaint, in 2002, KFCC entered into two franchise agreements with defendant Texas Petroplex, Inc, a Texas corporation with a principal place of business in Texas. The franchise agreements were for the operation of two KFC restaurants in Texas. Defendants Mohammad Tatari and Naim Tatari are the shareholders, owners, and/or officers of Texas Petroplex. They, along with defendants Hala Tatari and Lama Tatari, each signed guaranty

---

[1] Defendant Hala Tatari did not join in either the motion to dismiss or the motion to stay.

agreements, personally guaranteeing the performance, payment, and discharge of all of Texas Petroplex's obligations to KFCC. The individual defendants are all residents of Texas.

Allegedly, in August 2011, KFCC determined that Texas Petroplex had breached both franchise agreements. Accordingly, KFCC sent letters to Texas Petroplex terminating the agreements and stating that Texas Petroplex was required to comply with various post-termination obligations set forth in the franchise agreements, including ceasing doing business as a KFC restaurant, discontinuing use of KFCC's trademarks, returning KFCC's confidential materials and trade secrets, and renovating the restaurants to prevent public confusion that the restaurants were connected with KFC. However, the defendants supposedly failed to comply with their post-termination obligations, and instead continued to operate their restaurants as KFC outlets and to use KFC trademarks.

In its complaint, KFCC seeks a declaratory judgment that the Franchise Agreements were terminated in August 2011 and that the defendants must comply with their post-termination obligations. KFCC also brings claims for monetary and injunctive relief for breach of contract, trademark infringement, and false representation under the Lanham Act.

On September 21, 2011, KFCC filed a motion for a preliminary injunction. The next day, the defendants, except Hala Tatari, filed one of the motions at issue here, to dismiss the action for lack of personal jurisdiction and for improper venue.[2] The defendants, again excepting Hala Tatari, also filed a separate motion to stay consideration of KFCC's motion for a preliminary injunction until after the court rules on the motion to dismiss.

---

[2] Naim and Lama Tatari also initially sought to dismiss for lack of proper service. However, they stated in their reply papers that they were no longer seeking dismissal on that ground because after filing their initial motion papers they had been properly served with requests to waive service of process and had executed those waivers.

**II**

A.

The plaintiff bears the burden of establishing personal jurisdiction. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). When a district court resolves a motion to dismiss for lack of personal jurisdiction by relying on written submissions and affidavits rather than holding an evidentiary hearing, the plaintiff is only required to make a prima facie showing that personal jurisdiction exists to defeat the motion. *Id.*; *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). To meet that burden, the plaintiff must "establish[] with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction." *Neogen*, 282 F.3d at 887 (quoting *Provident Nat'l Bank v. California Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 2987)). Without a hearing, the court must construe the pleadings and affidavits in the light most favorable to the plaintiff, *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996), and cannot "consider facts proffered by the defendant that conflict with those offered by the plaintiff." *Neogen*, 282 F.3d at 887.

To determine whether personal jurisdiction exists, a federal court applies the law of the forum in which it sits, subject to the requirements of constitutional due process. *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997). While courts previously held that Kentucky's long-arm statute, KRS § 454.210, extends to the outer reaches of due process, *see, e.g.*, *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 730 F. Supp. 2d 683, 689 (W.D.Ky. 2010), the Kentucky Supreme Court has recently clarified that the statute is not, *per se*, coextensive with the limits of federal due process. *Caesars Riverboat Casino, LLC v. Beach*, 336

S.W.3d 51, 56 (Ky. 2011). Instead, the Kentucky Supreme Court held, a defendant's conduct and activities must fall within one of the nine specific provisions in the statute before a Kentucky court may exercise personal jurisdiction over a defendant. *Id.* When assessing whether specific personal jurisdiction exists, a court must examine each claim independently to determine whether the cause of action arises from the defendant's contacts Kentucky. *Preferred RX, Inc. v. Am. Prescription Plan, Inc.*, 46 F.3d 535, 550 (6th Cir. 1995).

B.

The following is a summary of the facts relevant to the personal jurisdiction issue, construing the pleadings and affidavits in the light most favorable to KFCC, as the court must. KFCC is headquartered in Louisville, Kentucky. KFCC approves KFC franchisees and enters into franchise agreements from its Kentucky headquarters. At the Kentucky headquarters, KFCC has also developed requirements for its franchisees in areas such as menu items, advertising, and physical facilities. Further, KFCC has developed trademarks and it monitors and enforces the use of those trademarks from its Kentucky headquarters.

Mohammad Tatari, through his broker, contacted Tricon Global Restaurants in Dallas, Texas, to obtain information about opening a KFC franchise. Mohammad Tatari met with two Tricon employees, Mike Koeninger and Hershell Sanders, to discuss becoming a franchisee. In turn, Koeninger and Sanders directly communicated with KFCC headquarters, which would then make the final decision as to whether to approve a franchise application.

On April 21, 2001, Mohammad Tatari filled out a preliminary questionnaire. The questionnaire stated that it was to be returned to Pam Campbell at KFCC in Louisville, Kentucky. In May of 2001, Mohammad Tatari and his wife at the time, Hala Tatari, filled out an

application for a franchise from KFCC; the application contained information about Mohammad and Hala Tatari's finances and background. The application indicated that it was to be returned to KFCC in Louisville, Kentucky. Mohammad and Hala Tatari's franchise application was sent to Stephen Early, the vice-president in charge of franchise administration, at the KFCC Kentucky headquarters for approval.[3] After submission of the application, KFCC continued to communicate with Mohammad and Hala Tatari. Finally, on July 9, 2001, Early sent Mohammad Tatari a letter that stated, "We have reviewed your application to become a KFC Franchisee and have found that you meet our requirements." It continued that the next step in the process was to "work with your Franchise Business Leader, Mike Koeninger, to apply for the Option Agreement for the specific location that [Mohammad Tatari had] identified." The letter directed Mohammad Tatari to stay in contact with Koeninger.

In October 2001, Mohammad Tatari and his brother Naim Tatari formed a corporation named Texas Petroplex. Texas Petroplex was incorporated in Texas and its principal place of business was in Texas. Mohammad and Naim Tatari were the only two shareholders of the corporation. Mohammad Tatari was the president and Naim Tatari the vice-president.

In December 2001, Judy Kroh, the franchise contract administrator at KFCC, sent Mohammad Tatari a franchise application for Naim Tatari to fill out. The franchise application stated that Naim Tatari was applying to KFCC for the issuance of a franchise to Texas Petroplex, of which Naim Tatari was a partner and part owner. The application requested financial and background information about Naim Tatari and his wife, Lama Tatari. Naim and Lama Tatari filled out the application and signed it.

[3] The defendants assert that when they provided a document to KFCC, they did so through Tricon in Dallas. KFCC does not provide this court any evidence to believe otherwise.

Additionally in December 2001, Kroh sent Mohammad Tatari copies of a franchise option agreement, franchise agreement, and other documents to sign. An accompanying letter asked Mohammad Tatari to return the signed documents to Kroh and stated that the agreements would not be binding until they were countersigned by an officer or other authorized representative of KFCC.

The option agreement stated that it was between KFCC, which had its principal place of business in Kentucky, and Texas Petroplex. The option agreement provided, *inter alia*, that only upon approval of KFCC of the site and plot plans could Texas Petroplex begin construction of his restaurant. It also provided that the option agreement would be governed by Kentucky law, and that Texas Petroplex waived objection to the jurisdiction of any state or federal court in Jefferson County, Kentucky for actions relating to the option agreement. Mohammad Tatari signed the option agreement as president of Texas Petroplex and returned it to KFCC, where Early countersigned the option agreement on KFCC's behalf. Kroh sent Mohammad Tatari a copy of the countersigned option agreement along with a letter explaining that Mohammad Tatari would be required to submit to KFCC his building plans for review and approval.

The franchise agreement also stated that it was between KFCC and Texas Petroplex. The agreement, which was dated January 17, 2002, was for a term of 20 years unless terminated sooner. The agreement stated, *inter alia*, that KFCC had its principal office in Louisville, Kentucky and that the agreement had been made and accepted in Kentucky and should be interpreted in accordance with Kentucky law. It also provided that any notices or other communications provided for within the franchise agreement were required to be in writing and would be deemed sufficiently given if they were delivered in person or by certified mail to KFC

at a Post Office Box in Louisville Kentucky directed to the attention of the vice president–franchising. The franchise agreement provided that, “[i]n order to enhance the value of the system and trademarks and goodwill associated therewith, this Agreement places detailed and substantial obligations on the Franchisee including strict adherence to KFC’s reasonable present and future requirement regarding menu items, advertising, physical facilities, etc.” In particular, the franchise agreement stated that the franchisee must “strictly comply with all reasonable standards, specifications, processes, procedures, requirements, and instructions of KFC regarding the operation of the business which now exist or may be established from time to time.” Additionally, the franchisee was required to pay royalties to KFCC each month, either directly or via mail addressed to KFCC.

Mohammad Tatari, as president of Texas Petroplex, signed the franchise agreement, which was then returned to KFCC headquarters in Louisville. There Early countersigned the agreement on behalf of KFCC. Mohammad and Naim Tatari, as well as Early, also signed a control person addendum to the franchise agreement, stating that Mohammad and Naim Tatari constituted the entirety of the shareholders of Texas Petroplex and that Mohammad Tatari was to be responsible for the control and operation of the KFC outlets covered by the franchise agreement.

In addition to the franchise agreement and option agreement, Mohammad Tatari, as president of Texas Petroplex, also signed an advertising agreement with the KFC National Council and Advertising Cooperative (“NCAC”). The advertising agreement stated that it was being made in consideration for KFCC entering into the franchise agreement. The advertising agreement provided that notices shall be sent to NCAC’s business address in Louisville,

Kentucky; that the agreement was to be governed by Kentucky law; that the franchisee acknowledged and confirmed its membership in the NCAC; and that the franchisee was required to make monthly contributions to the NCAC to be used for advertising for KFC.[4]

As for the individual defendants–Mohammad, Naim, Hala, and Lama Tatari–each of them personally signed a guaranty agreement. The guaranty agreement stated that it was made to induce KFCC and NCAC to enter into the franchise and advertising agreements. It provided that in the event of a default by Texas Petroplex, the guarantors, jointly and severally shall be required to discharge the obligations of Texas Petroplex, and that such "performance, payment or discharge shall be made at [KFCC and/or NCAC's] main office in Louisville, Kentucky."

In June of 2002, Mohammad Tatari, as president of Texas Petroplex, signed two more agreements with KFCC, each of which identified KFCC as having its principal place of business in Louisville. First, Tatari signed an address amendment changing the location where he was to operate a KFC outlet. Second, he signed a Pizza Hut "2N1" amendment allowing him to also operate a Pizza Hut outlet at the location of his KFC outlet.

Later in 2002, Texas Petroplex and KFCC entered into another franchise agreement for Texas Petroplex to operate a second KFC outlet in Texas. For that second outlet, Mohammad Tatari again signed an option agreement after receiving letters and copies of the agreements from Kroh. Then, Mohammad Tatari, on behalf of Texas Petroplex, signed a franchise agreement with KFCC and an advertising agreement with NCAC. Mohammad Tatari and Naim Tatari also signed a control person addendum. Finally, Mohammad, Naim, Hala, and Lama Tatari all signed a guaranty agreement. The franchise agreement, advertising agreement, control person

---

[4] Tatari states that he mailed royalty payments owed to KFCC to a P.O. Box in Georgia and mailed advertising payments owed to NCAC to a P.O. Box in Pennsylvania.

addendum, and guaranty agreement were identical in pertinent parts to the ones signed for the first franchise outlet.

According to KFCC's complaint, Texas Petroplex breached one of the franchise agreements by assigning its duties and obligations to other entities without the written authorization of KFCC. KFCC similarly alleges that Texas Petroplex breached the other franchise agreement by assigning its duties and obligations under that agreement to another entity. KFCC also asserts that the second franchise agreement was breached by Mohammad Tatari's operation of a Church's Chicken restaurant, which is a competitor of KFCC's. KFCC claims that it notified Texas Petroplex of the breaches of both franchise agreements and sent letters terminating to Texas Petroplex terminating those agreements. However, KFCC alleges that Texas Petroplex continues to operate its restaurants as KFC outlets, and neither it nor the guarantors complied with their post-termination obligations.

C.

The court begins with the question of whether it has personal jurisdiction over the corporate defendant, Texas Petroplex. KFCC's claims against Texas Petroplex generally fall into two categories: those premised upon the defendants' alleged breaches of contract and those premised upon the defendants' alleged continuing violations of KFCC's trademarks.

KFCC's contract claims against Texas Petroplex are based on supposed breaches of the franchise agreements. In Count I, KFCC seeks a declaratory judgment that it terminated the franchise agreements due to Texas Petroplex's alleged breaches, and in Count II, KFCC seeks damages and injunctive relief for the supposed breaches. Relevant here, the Kentucky long-arm statute provides that personal jurisdiction over a defendant is proper when the claims against that

defendant arise from the defendant's "[t]ransacting any business in th[e] Commonwealth." KRS § 454.210(2)(a)(1). KFCC's contract claims against Texas Petroplex fit within that category. Texas Petroplex sought to contract with KFCC to open KFC franchises. The franchise agreements specifically stated that they were made and accepted in Kentucky. And, Texas Petroplex signed the agreements first, before the agreements were sent back to Kentucky for KFCC to countersign there.[5] Thus, not only did the contracts provide that they were made and accepted in Kentucky, but, as a factual matter, the agreements were made in Kentucky. *Graham v. TSL, Ltd.*, 350 S.W.3d 430, 432-433 (Ky. 2011) ("A contract is made at the time the last act necessary for its formation is complete and at the place where that act is performed."). The making of the contracts in Kentucky certainly constitutes the transaction of business in Kentucky, and there is no doubt that KFCC's claims for breach of that contract arise from those transactions of business.

Besides the breach of contract claims, KFCC alleges in Count IV that Texas Petroplex infringed its trademarks by continuing to hold itself out as a KFC franchisee even after KFCC had terminated the franchise agreements and revoked the license and authority to use KFC trademarks. In Count V, KFCC brings a claim for federal unfair competition, alleging that Texas Petroplex's continued use of KFCC's trademarks is a false designation of origin or false representation, and constitutes the utilization of false descriptions and representations in interstate commerce.

---

[5] That Texas Petroplex may have sent the signed, but not yet countersigned, franchise agreements to KFCC via Tricon in Dallas makes no difference. There is little doubt that Texas Petroplex was aware that the documents were going to KFCC headquarters in Kentucky, as the parties' course of dealings and the language in the contracts made clear that KFCC was the party with whom Texas Petroplex was contracting.

As detailed above, Texas Petroplex transacted business in Kentucky by entering into the franchise agreements in Kentucky. Thus, under the Kentucky long-arm statute, the question is whether the trademark claims arise from those transactions of business in Kentucky. *See* KRS § 454.210(2)(a). The court finds that it does.

As noted above, the trademark claims arise from Texas Petroplex's alleged continuing to hold itself out as a KFC franchisee and use KFCC's trademarks even after KFCC supposedly terminated the franchise agreements. In fact, discontinuing use of KFCC's trademarks upon termination of the agreements was an explicit requirement of section 3.4 of the franchise agreements. The Kentucky Supreme Court has explained that the phrase "arising from" in the long-arm statute means that there is a "reasonable and direct nexus between the wrongful acts alleged in the complaint and the statutory predicate for long-arm-jurisdiction." Because Texas Petroplex's entering into the franchise agreements constitutes the statutory predicate for long-arm jurisdiction, and the trademark claims arise from the termination of those contracts, the court finds that a "reasonable and direct nexus" between the claims and the statutory predicate exists. Accordingly, as to Texas Petroplex, the long-arm statute is met.

Thus, the court turns to whether the exercise of personal jurisdiction over Texas Petroplex is consistent with the requirements of due process. The Sixth Circuit employs a three-part test for determining whether personal jurisdiction is proper under the constitution:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir. 2002) (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

Under the first prong–whether the defendant purposefully availed himself of the privilege of acting or causing a consequence in the forum state–jurisdiction is proper where the defendant deliberately has engaged in significant activities in the forum state or created continuing obligations between himself and residents of the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-476 (1985). There is no requirement that a defendant physically enter a forum state. *Id.*

The Supreme Court's opinion in *Burger King* provides guidance in this case. In *Burger King*, the Supreme Court considered whether it was appropriate for a Florida court to exercise jurisdiction over a Michigan resident who had contracted with Florida-based Burger King Corporation to open a Burger King franchise in Michigan. In explaining the relevant analysis, the Supreme Court stated that "an individual's contract with an out-of-state party" was, by itself, not enough to "establish sufficient minimum contacts in the other party's home forum." *Burger King*, 471 U.S. at 478. The Court "emphasized the need for a 'highly realistic' approach" to the question and directed that courts evaluate the "prior negotiations and contemplated future consequences" of a contract, "along with the terms of the contract and the parties' actual course of dealing" to determine "whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479.

Turning to the facts of the case, the Court in *Burger King* noted that the franchisee had never visited Florida. 471 U.S. at 479. However, the Supreme Court found that personal jurisdiction in Florida was proper because the franchisee had deliberately negotiated with a

Florida corporation for a long-term franchise agreement "and the manifold benefits that would derive from affilitiation with a nationwide organization." *Id.* at 480. Once the franchisee obtained approval, he "carefully structured a 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." *Id.* The court further noted that the franchisee's "refusal to make the contractually required payments in Miami, and his continued use of Burger King's trademarks and confidential business information after his termination, caused foreseeable injuries to the corporation in Florida." *Id.* Rejecting the contention that jurisdiction was improper because the franchisee dealt with a regional office in Michigan to establish his franchise in that state, the Supreme Court stated that the contract documents "emphasize that Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced from Miami." *Id.* The Supreme Court further stated that "the parties' actual course of dealing repeatedly confirmed that decisionmaking authority was vested in the Miami headquarters and that the district office served largely as an intermediate link between the headquarters and the franchisees." *Id.* at 480-481. Finally, the Court held that provisions in various franchise documents that disputes would be governed by Florida law would be insufficient to confer jurisdiction standing alone, but in combination with the other evidence the provisions "reinforced [the franchisee's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Id.* at 481-482.

Many of the factors the Supreme Court found relevant in determining that the franchisee in *Burger King* was subject to the jurisdiction of a Florida court are present in this case with respect to Texas Petroplex. Although Texas Petroplex did not have any physical connection with

Kentucky, it entered into an extensive, long-term franchise agreement with a Kentucky corporation. Texas Petroplex negotiated two 20-year agreements with KFCC, a Kentucky corporation, because of the "manifold benefits" that would come from being able to hold itself out as a KFC outlet. *Burger King*, 471 U.S. at 480. The franchise agreements stated that KFCC's address was in Louisville, Kentucky, and they provided that Texas Petroplex would be required to strictly adhere to KFCC's "reasonable present and future requirements regarding menu items, advertising, physical facilities, etc." Thus, it was clear that Texas Petroplex would be subject to continued operational oversight from KFCC throughout the length of the agreements, and that KFCC would be developing at its Kentucky headquarters the standards by which Texas Petroplex would have to operate its restaurant. Moreover, the agreements provided that Kentucky law would govern them, that the agreements were made and accepted in Kentucky, and that all notices and other communications would go to KFCC's post office box in Louisville, Kentucky. *See id.* at 481-482. Finally, there is little doubt that Texas Petroplex was aware that the alleged breaches of the agreement and infringements of KFCC's trademarks after termination of the agreements would harm KFCC in Kentucky. *Id.* at 480.

Additionally, the franchise agreements and the parties' dealings made clear that Tricon was simply an intermediary between Texas Petroplex and KFCC. Every document signed by Texas Petroplex, including the franchise agreements, contained KFCC's name on it and said nothing about Tricon. As noted above, the franchise agreements also provided that notices and other communications were to be sent to KFCC in Kentucky. Similarly, the agreements provided that Texas Petroplex was to pay royalties to KFCC each month.[6] Moreover, when Texas

[6] The defendants note that they mailed their payments to states other than Kentucky. continue...

Petroplex received communications about entering and then finalizing the option agreements and franchise agreements, the communications were from persons at KFCC's headquarters in Kentucky, namely Stephen Early, the vice-president in charge of franchise administration, and Judy Kroh, the franchise contract administrator. In short, the court finds that Texas Petroplex's negotiation for, and decision to enter into, two long-term franchise agreements requiring continuing obligations from Texas Petroplex to KFCC and vice versa was sufficient to meet the purposeful availment factor.

Turning to the second factor of the due process test, KFCC's causes of action against Texas Petroplex arise from its contacts with Kentucky. KFCC's breach of contract claims clearly relate to the franchise agreements between Texas Petroplex and KFCC. And, as detailed above, its trademark infringement claims arise from Texas Petroplex's alleged continuing use of KFCC's trademarks even after KFCC terminated the franchise agreement that had granted Texas Petroplex a license to use those trademarks.

When the first two prongs of the due process test are met, an inference arises that the third prong, the reasonableness of the exercise of jurisdiction, is also present. *First Nat'l Bank of Louisville v. J. W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir. 1982). The question of whether an exercise of jurisdiction is reasonable must balance "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Youn v. Track, Inc.*, 324 F.3d 409, 419 (6th Cir. 2003). Here, the forum state, Kentucky, has an obvious interest in resolving the dispute of its resident. While it will burden Texas Petroplex to defend its case from

---

[6]...continue
However, no matter that KFCC apparently had Texas Petroplex mail its payments to states other than Kentucky, there is little doubt that the payments were being made to KFCC, which the franchise agreement and other documents made clear was headquartered in Kentucky.

Texas, the inference of reasonableness that arises from the fulfillment of the first two prongs of the test and the interests of the forum state are sufficient to find that the third prong is met in this case. Accordingly, this court finds that it may exercise personal jurisdiction over Texas Petroplex.

D.

The court next examines whether it may exercise personal jurisdiction over the individual defendants that have moved for dismissal. Each of those individual defendants signed two guaranty agreements with KFCC. The two agreements guaranteed the full performance of all of Texas Petroplex's obligations under the two franchise agreements. KFCC contends that by signing the guaranty agreements, the guarantors were transacting business in Kentucky, and thus that the guarantors fall within the first category of the Kentucky long-arm statute.

However, unlike with Texas Petroplex, the question of whether the guarantors transacted business in Kentucky is not so clear-cut. On the one hand, the guaranty agreements were clearly intended to induce KFCC and NCAC to enter into franchise agreements and advertising agreements with Texas Petroplex. But neither KFCC nor NCAC actually signed the guaranty agreements; the guaranties were signed only by the individual guarantors. It is also not disputed that the guarantors never traveled to Kentucky, but signed the agreements in Texas. And, unlike the franchise agreements, the guaranty agreements do not state that they were made in Kentucky. Thus, while the guarantors certainly should have realized that they were inducing a Kentucky company to enter into a contract with Texas Petroplex, and that they may ultimately have had some obligation to that Kentucky company, it is less clear that the guarantors were "[t]ransacting any business in Kentucky."

But even assuming that the signing of the guaranty agreements was enough to satisfy the Kentucky long-arm statute, the court finds that the exercise of jurisdiction over the individual defendants would violate their due process rights. As an initial matter, the simple fact that the individuals signed an agreement with a Kentucky company would be insufficient, without more, to allow for the exercise of jurisdiction In *Burger King*, the Supreme Court stated, "If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." 471 U.S. at 478. Instead, as noted above, the key issue is whether the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" show that the defendant "purposefully established minimum contacts within the forum." *Id.* at 479.

Even taking into account that the guaranty agreements induced KFCC and NCAC to enter into long-term contracts with Texas Petroplex, the signing of the guaranty agreements does not constitute the "minimum contacts" that would be sufficient to support the exercise of jurisdiction over the individual defendants.

This court finds compelling the decision in *Long John Silver's, Inc. v. DIWA III, Inc.*, 650 F. Supp. 2d 612 (E.D.Ky. 2009). That case, like this one, involved an alleged breach of a franchise agreement between an out-of-state franchisee and Long John Silver's, a Kentucky corporation. *Long John Silver's*, 650 F. Supp. 2d at 614-617. Like here, the Kentucky court in *Long John Silver's* grappled with the question of whether it could exercise personal jurisdiction over a nonresident guarantor of the performance of an out-of-state franchisee of the Kentucky corporation. *Id.* at 620-627. The court noted that there was no evidence that the guarantor ever

traveled to Kentucky or had communications with Long John Silver's regarding the guaranties he signed. *Id.* at 620. The court stated that while the guarantor's obligations under the guaranty agreement *could* require him to make payments to Long John Silver's in Kentucky, that would only be true if the franchisee failed to make the payments it owed. *Id.* at 621. In other words, the court stated, "the parties did not contemplate regular contacts between [the guarantor] and the Kentucky corporate plaintiff." *Id.* Any contact between the two would be "random," and would occur only if the franchisee failed to perform. *Id.*

The *Long John Silver's* court convincingly distinguished two cases cited by KFCC: *National Can Corp. v. K Beverage Co.*, 674 F.2d 1134 (6th Cir. 1982) and *Perry v. Central Bank & Trust Co.*, 812 S.W.2d 166 (Ky. Ct. App. 1991). *Long John Silver's*, 650 F. Supp. 2d at 621-622. In both *National Can* and *Perry*, the courts found that personal jurisdiction over an out-of-state guarantor existed. However, in both of those cases, at least one key element was present that is missing here and was missing in *Long John Silver's*: that the guaranty agreements were signed to induce a loan of money to be invested in a Kentucky business. *See National Can*, 674 F.2d at 1138; *Perry*, 812 S.W.2d at 169. Here, the franchisee was a Texas corporation and the franchise outlets were located in Texas.

In short, the court in *Long John Silver's* concluded, after a thorough analysis, that it did not have jurisdiction over an out-of-state guarantor of an out-of-state franchisee's obligations under a franchise agreement with a Kentucky corporation. *See also Fazoli's Franchising Sys., LLC v. JBB Invs., LLC*, 2008 WL 4525433, at *4 (E.D.Ky. Sept. 30, 2008) (concluding that due process prohibited the exercise of jurisdiction over a defendant who entered into a guaranty agreement with a Kentucky-based corporation guaranteeing a franchise agreement between a

nonresident third-party and the Kentucky corporation). That was true even where, unlike here, the franchise agreement itself contained a forum selection clause. *Long John Silver's*, 650 F. Supp. 2d at 624-627; *Fazoli's*, 2008 WL 4525433, at *6. The court agrees with the reasoning in *Long John Silver's*, and thus concludes that the fact that Mohammad, Naim, and Lama Tatari signed guaranty agreements does not, standing alone, confer this court the power to exercise personal jurisdiction over those defendants.

Nor does the individual defendants' other contacts with KFCC serve to render those defendants subject to this court's jurisdiction. The individual defendants' other contacts with KFCC were entirely too sparse and attenuated to conclude that, even in combination with the fact that they signed guaranty agreements, they purposefully availed themselves of the privilege of acting in Kentucky. Each of the individual defendants signed a franchise application providing financial and background information about them. However, the franchise applications primarily served the purpose of inducing KFCC to enter into the franchise agreement with Texas Petroplex, not with the individuals. And while the information provided on those applications may also have served to help KFCC determine that the individuals were suitable guarantors, the court has already determined that actually entering into those guaranty agreements is an insufficient basis to exercise personal jurisdiction over the guarantors. That they filled out a single application a piece is not enough to change the court's analysis in that regard.

Beyond those franchise applications, Mohammad and Naim Tatari signed two control person addendums, one for each franchise agreement. Those control person addendums were nothing more than statements that Mohammad Tatari was the person responsible for representing Texas Petroplex in its dealings with KFCC. KFCC also points out that Mohammad Tatari

initially sought information about establishing a franchise prior to the time when Texas Petroplex was incorporated. In doing so, he filled out a preliminary questionnaire and consulted with Tricon, in addition to filling out the franchise application noted above. However, Mohammad Tatari's initial solicitation of a franchise agreement was far too limited to find that Mohammad Tatari engaged in the sort of "significant activities" that created a "substantial connection" between the individuals and Kentucky. *See Burger King*, 471 U.S. at 475-476. Indeed, given that the ultimate result of Mohammad Tatari's solicitation of a franchise was a franchise agreement between Texas Petroplex and KFCC, not between Mohammad Tatari and KFCC, it also cannot be said that Mohammad Tatari's dealings with KFCC prior to the incorporation of Texas Petroplex created any sort of "continuing obligations" between Mohammad Tatari and KFCC. *Id.* at 476.

In short, the fact that the individual defendants entered into guaranty agreements and had other sparse contacts with KFCC were not the sort of substantial connections to Kentucky that would allow for this court to conclude that the defendants purposefully availed themselves of Kentucky's laws. Accordingly, the court finds that it lacks jurisdiction over the claims against Mohammad, Naim, and Lama Tatari.

**III.**

The defendants have also moved to stay KFCC's motion for a preliminary injunction pending the resolution of their motions to dismiss. This court having resolved those motions to dismiss, the motion to stay is now moot.

**IV.**

Finally, the defendants, including Texas Petroplex, the sole defendant over whom this court has found it has personal jurisdiction, also sought dismissal for improper venue. KFCC requests in its response to the defendants' motion to dismiss that if the court found that its complaint should be dismissed due to lack of personal jurisdiction or improper venue, the court transfer the action to the United States District Court in Texas rather than dismiss it outright (DN 19 at 37 n.11).

The court will transfer the action to the United States District Court for the Northern District of Texas under 28 U.S.C. § 1404(a). That statute provides, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

The court finds that a transfer to the United States District Court for the Northern District of Texas would be consistent with the interest of justice. Such a transfer would comport with KFCC's request that the court transfer the action rather than dismiss it outright. Moreover, while it would be possible to transfer only the claims against Mohammad, Naim, and Lama Tatari–the defendants over whom this court has determined it does not have personal jurisdiction–the interest of justice would be better served by transferring the entire case. That would allow for all the claims, which are all factually related, to be tried in one action, as would be most efficient.

Moreover, a transfer would also be consistent with the defendants' insistence that venue in this court is improper. Although the court disagrees and believes that venue is proper in this court for KFCC's claims against Texas Petroplex because a "substantial part of the events or

omissions giving rise to the claim occurred" in the Western District of Kentucky, 28 U.S.C. § 1391(b), it is also true that a "substantial part of the events or omissions giving rise to the claim occurred" in or around Dallas, Texas, where Texas Petroplex operated its franchise outlets.[7] Moreover, unlike in Kentucky, there appears to be no question that all of the defendants are Texas residents, and thus subject to personal jurisdiction in Texas. Finally, the court is cognizant of the fact that Texas would be more convenient not just for the defendants, but also for a number of witnesses.[8]

In light of KFCC's request for a transfer rather than dismissal and the defendants' complaints about KFCC's initial choice of this court as a forum, the court finds that the interests of justice would best be served by a transfer.

**V.**

In conclusion, the defendant's motion to dismiss will be granted to the extent of finding that the court cannot exercise personal jurisdiction over Mohammad Tatari, Naim Tatari, and

---

[7] With regard to whether venue in this court would be proper, the court notes that KFCC negotiated the franchise and other agreements from its headquarters in Kentucky, and the franchise agreements were actually completed in Kentucky. That constitutes a "substantial part of the events" giving rise to KFCC's claims for breach of contract and trademark infringement. *See* 14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3806.1 (2007) ("In the electronic age, when face-to-face encounters are less common, the letters, facsimiles, e-mails, and telephone calls that are transmitted from, and received in, a district during the negotiation and execution of a contract often are deemed substantial events in the district for venue purposes."). Nor is that conclusion changed by the fact that a substantial portion of the events also occurred in Texas. *See id.* (noting that "it is now absolutely clear as a result of the extensive case law that has developed over the years that there can be more than one district in which a substantial part of the events giving rise to the claim occurred").

[8] To be sure, the defendants had moved as of yet only for a dismissal for improper venue, not for a transfer to a more convenient jurisdiction. But their primary argument was that Kentucky was not a proper venue while Texas was (*see* Mot. to Dismiss, DN 13-1 at 15 ("A substantial part of the events or omissions giving rise to the claim occurred in Texas, . . . not in this district."). Thus, although a transfer was not the requested relief of the defendants, a transfer comports with the defendants' argument against venue.

Lama Tatari, and thus transferring the action to the United States District Court for the Northern District of Texas. The defendants' motion to stay KFCC's motion for a preliminary injunction will be denied as moot.

A separate order will issue in accordance with this opinion.

October 4, 2012

**Charles R. Simpson III, Judge**
**United States District Court**

D03